UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
ANTHONY MANNS,

                      Plaintiff,                    NOT FOR PUBLICATION
-against-                                  **MEMORANDUM & ORDER**
                                                      13-CV-3668 (CBA) (LB)
UNITED AIRLINES,

                      Defendant.
-----------------------------------------------------------x

**AMON, United States District Judge:**

Plaintiff Anthony Manns brings the instant action against his former employer, United Airlines ("United"), alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and § 504 of the Rehabilitation Act, 29 U.S.C. § 794. Manns claims he became disabled as a result of a workplace injury, and United failed to accommodate his disability and wrongfully terminated him on the basis of his disability. Manns seeks reinstatement, back pay, restoration of lost benefits, compensatory damages, and attorney's fees. United moves for summary judgment on his claims. For the following reasons, the Court grants United's motion.

## BACKGROUND[1]

In 1995, Manns began working for United[2] as a customer service agent in Houston, Texas. (Def. 56.1 ¶ 7; D.E. # 81, Ex. B ("Manns Dep. I") at 44.) In 2007, Manns was transferred to

---

[1] The following facts are drawn from United and Manns's Rule 56.1 Statements of Undisputed Facts, (D.E. # 82 ("Def. 56.1"); D.E. # 89 ("Pl. 56.1"); D.E. # 84 ("Def. Reply 56.1")), the exhibits attached to those statements, and Manns's declaration, (D.E. # 86 ("Manns Decl.")), which provides his narrative of the facts. United vigorously disputes the validity of the denials and qualifications Manns includes in his Rule 56.1 Statement on the grounds that he does not cite to relevant portions of the record when asserting that a fact is in dispute. (See D.E. # 83 ("Def. Reply") at 9–10 (noting that under Local Rule 56.1(d) parties "must cite to relevant portions of the record when asserting that [a] fact is or is not in dispute"); Def. Reply 56.1 ¶¶ 12, 14, 16, 18–19, 44–45.) United requests that the Court deem these statements admitted. Although the Court could deem these statements admitted for the purposes of this motion, see Local Civ. R. 56.1(c), the Court has broad discretion to overlook Manns's noncompliance with the local rule and to "conduct an assiduous review of the record," Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001) (internal quotation marks and citations omitted). Where Manns denies a fact in his Rule 56.1 Statement, the Court has accordingly engaged in an independent review of the record to determine whether the fact at issue is in dispute.

[2] Manns actually began his employment with Continental Airlines, which is now known as United. (Def. 56.1 ¶ 7.) For simplicity, the Court will refer to Manns's employer as United throughout this Memorandum and Order.

1

United's Newark, New Jersey, location where he was employed as a ramp service employee until his termination in November 2012. (Def. 56.1 ¶¶ 7, 42.) According to United's job description, ramp service employees are required to: (1) repeatedly lift baggage, boxes, or cargo weighing up to 70 pounds when loading and unloading aircraft, carts, and containers; (2) push and pull loaded and empty carts; (3) stand for up to four hours; and (4) complete other "similarly strenuous" activities. (Id. ¶ 8; see D.E. # 81 ("Bruno Decl."), Ex. I at 1.) In addition, all employees are provided with United's Working Together Guidelines, which establishes United's policies regarding employee conduct. (Def. 56.1 ¶¶ 9, 11.) The September 2012 Working Together Guidelines states that employees should, among other things, "[c]ommunicate and perform all duties in a safe, courteous, helpful, competent, dependable and businesslike manner" and "[r]efrain from aggressive or threatening behavior, whether through words or actions." (Bruno Decl., Ex. H at 1.) The Working Together Guidelines specifies that "[c]o-workers who violate this policy are subject to corrective action, including discipline or termination of employment." (Id. at 8, 10.)

## I. Manns's Workplace Injuries

Manns sustained multiple occupational injuries while working for United. (Def. 56.1 ¶ 55.) Manns first injured his back in 2005. (Manns Decl. ¶ 5.) He was subsequently diagnosed with sciatica and took a three-month leave of absence from work. (Id.) Manns states that he was then able to return to work "with no further medical issues and was able to perform [his] job responsibilities with no difficulty thereafter." (Id.) Manns injured his back again in 2010. (Id. ¶¶ 7–8.) Manns then took another three-month leave of absence. (Id. ¶ 8.) After this leave of absence, however, he claims that he was still in pain from his injury when he returned to work. (Id.)

2

In 2012, Manns reinjured his back. (Id. ¶ 12.) He reported this injury to his supervisor and was referred to the Take Care Clinic (the "Clinic"), a third-party healthcare provider that, at the time, had a contract to provide immediate healthcare services to United employees. (Id.; Def. 56.1 ¶ 59.) The Clinic evaluates employees and makes recommendations about whether they can return to work or should be referred to United's Transitional Duty Office for a light duty assignment. (Def. 56.1 ¶ 60.) The following timeline summarizes Manns's visits to various doctors and their corresponding diagnoses and recommendations for treatment:

- In April 2012, the Clinic recommended that he be placed "off work" effective April 15, 2012, "pending a determination of compensability by Gallagher Bassett Services," United's workers' compensation claims administrator (Def. 56.1 ¶¶ 58, 61.) After reevaluation by the Clinic, Manns was returned to full duty effective April 19, 2012. (Id. ¶ 61.)
- On June 10, 2012, the Clinic diagnosed Manns with a shoulder girdle strain and placed him on light duty. (Id. ¶ 62; Manns Decl. ¶ 12.)
- On June 18, 2012, Manns returned to the Clinic and was placed on light duty with vendor contract audits. (Def. 56.1 ¶ 63; Manns Decl. ¶ 13)
- On June 21, 2012, Manns returned to the Clinic, was again placed on light duty, and was given a follow-up appointment on June 28. (Manns Decl. ¶ 14; Manns Decl., Ex. B.)
- On June 28, 2012, Manns returned to the Clinic, was continued on "transitional duty," and was referred to Dr. Thomson for an orthopedic evaluation. (Manns Decl. ¶ 15; Manns Decl., Ex. C.)
- On July 13, 2012, Dr. Thomson diagnosed Manns with "lumbosacral / cervical radiculopathy" and recommended that Manns "continue with light duty." (Manns Decl. ¶ 16; Manns Decl., Ex D.)
- On July 16, 2012, Manns went "on [his] own" to New York Downtown Hospital. (Manns Decl. ¶ 17.) Elvira Villafuerte, the "attending caregiver," diagnosed him with sciatica and recommended that he be excused from work through July 18. (Id.; Manns Decl., Ex. E.)
- On July 20, 2012, Manns returned to the Clinic, was diagnosed with an anxiety disorder, and was placed "off work" for seventy-two hours. (Manns Decl. ¶ 18; Manns Decl., Ex. F.)
- On July 26, 2012, Manns was "rushed" to the hospital in an ambulance, was diagnosed with sciatica, and was told not to return to work for one day. (Manns Decl. ¶ 19; Manns Decl., Ex. G.)
- On August 10, 2012, Manns was evaluated by Dr. Canario, who reported that Manns was "capable of working his full duty job" and that Manns's "chief complaint" concerned his transportation to and from work, not performance of his

work duties, and released him to full duty. (Def. 56.1 ¶ 64; Bruno Decl., Ex. W ("Canario Report") at 5.)

- On August 17, 2012, Manns returned to work and "immediately hurt himself." (Manns Decl. ¶ 21.) Although Manns claims the Clinic "refused to schedule an appointment, claiming they were not equipped to deal with the medical issues [he] was suffering from," (id.), a workers' compensation form dated August 17 placed him on light duty with the restriction that he could only lift up to 10 pounds and directed him to return for reevaluation on August 21, (Manns Decl., Ex. J).
- On August 17, 2012, Manns was treated by a Dr. Lavelanet, a private doctor, who diagnosed him with sciatica and stated that he could not return to work until August 21, 2012. (Manns Decl., Ex. M.) Manns claims he faxed this note to Khan. (Manns Decl. ¶¶ 23–24.) Manns subsequently called out sick on August 17 through August 19. (Manns Decl., Ex. O.)
- On August 27, 2012, Manns was treated by Dr. Laufer, a private doctor, who recommended that Manns not return to work until September 7, 2012, and scheduled a follow-up appointment on September 6. (Manns Decl., Ex. R at 1; see also Manns Decl. ¶ 28 (stating that he was put off work with a reevaluation set for September 4).) United appears to have complied with this recommendation and placed Manns "off work" as of August 27. (Manns Decl., Ex. R at 2.) He was scheduled for reevaluation by the Clinic on September 4. (Id.)
- On September 4, 2012, Manns failed to appear for his reevaluation, and Dr. Canario placed Manns back on full duty as of September 5, 2012. (Manns Decl. ¶ 30; Manns Decl. Ex. S.)

Two doctors evaluated Manns in 2013 and 2014 in support of his application for social security benefits. (See Manns Decl., Ex. CC; Def. 56.1 ¶¶ 77–78.) These doctors concluded that Manns was totally disabled and had been unable to "maintain full-time competitive work on a sustained basis" since August 17, 2012. (See Manns Decl., Ex. CC; Def. 56.1 ¶¶ 77–78.) When asked whether he would be able to perform his job as a ramp service agent with his current disability, Manns admitted that he could no longer lift 70-pound bags without pain, (Manns Dep. I at 174–75), but said, "I don't know what I would do if I get the proper care," (Bruno Decl., Ex. C ("Manns Dep. II") at 150).

II. Manns's Complaints

Manns claims that the incidents described above show that "United was not allowing a serious injury to heal and put [him] back to work in severe pain." (Manns Decl. ¶ 1.) Manns

4

claims that "[h]ad [he] been allowed to rest and recover, and then put on a job which did not require lifting heavy weight, [he] would be working to this day." (Id. ¶ 41.) United appears to have made a number of accommodations of Manns's injuries and personal issues in the past. Between 2007 and 2011, Manns requested and was granted a number of leaves of absence under the Family Medical Leave Act. (Def. 56.1 ¶¶ 50–54.) In addition, as described above, Manns was seen by the Clinic and placed on light duty assignments numerous times. (See id. ¶¶ 62–63, 66; Manns Dep. I at 175.)

United says that Manns never requested additional time off. Ava Parker, United's Senior Staff Representative for Workers' Compensation and Transitional Duty, testified that Manns "never requested any type of accommodation; never asked to be assigned to a different position or transferred to a different department; and never requested to have any additional time off." (Def. 56.1 ¶ 73; Bruno Decl., Ex. F ("Parker Dep.") at 34–36.) The only complaints Parker acknowledged receiving were "about the doctor or not seeing the doctor or just being dissatisfied with Gallagher Bassett." (Parker Dep. at 17.) Manns himself admitted that he did not ask his supervisors for any accommodation, (Def. 56.1 ¶ 72; Manns Dep. II at 153–54), although he maintains that he made complaints regarding his treatment by the Clinic. (See, e.g., Manns Dep. II at 153 ("I asked them to tell [the Clinic] to get me a doctor to heal me . . . because my injury is not being administered to.").)

### III. Workplace Incidents

During 2012, United received a number of reports regarding Manns's behavior toward individuals working for the Clinic, Gallagher Basset, and United. Although Manns disputes that the events underlying the reports occurred, (see, e.g., Pl. 56.1 ¶¶ 12–13; Manns Dep. II at 100–01), it is undisputed that the following incidents were reported to United:

5

- On August 3, 2012, Beverly Khan, a Staff Representative in United's Workers' Compensation and Transitional Duty Office reported concerns about Manns's "aggressive and loud" behavior at the Clinic and the Transitional Duty Office. (Def. 56.1 ¶¶ 13–14.) She noted that she "feel[s] he may be of concern" and "fear[s] our security." (Id. ¶ 13.)
- On August 17, 2012, Khan reported another incident with Manns. She stated that Manns came to the Clinic and "was visibly upset about being returned to full duty status" as of August 10. (Id. ¶ 15.) She reported that he said, "You all called me and put me back to full duty and I don't know why, I haven't even seen a doctor yet. You know in North Carolina where I'm from we have guns. That's how we take care of these things, we come back with guns and get ya'll." (Id.)
- On August 21, 2012, Ava Parker, a Senior Staff Representative in United's Workers' Compensation and Transitional Duty office, reported a conversation she had with Manns over the phone on August 17. (Id. ¶¶ 13, 22, 27.) She reported that he "became very agitated, argumentative, and aggressive" during the call and told her he "would be taking a sergeant with him" to his next appointment. (Id. ¶¶ 23–24.) He subsequently called her three more times on August 20. (Id. ¶ 26.)
- On September 5, 2012, Krystyna Boud, a Gallagher Bassett Supervisor, filed a police report about harassing phone calls she received from Manns. (Id. ¶¶ 28–29.) She reported that Manns "became irate" when she informed him that he was only entitled to four days of compensation, not three months of compensation, and said "I know what you're trying to do, you're trying to murder me." (Id. ¶ 29) In a later call, she reports that he said "I'm going to get you." (Id.)
- On September 5, 2012, Gail Dworak, another Gallagher Bassett employee, reported to Khan that Manns had called her seven times "each time being more belligerent than the last." (Id. ¶ 30.)

Manns claims that the employees involved did not believe his behavior was threatening. (See Pl. 56.1 ¶ 14 ("Khan said she never felt at risk."); Manns Decl. ¶ 25.) United's response to his behavior indicates that they took the reports seriously. Ed Eget, Human Resources Manager at United, testified that corporate security began monitoring Manns's travel after receiving Khan's August 17 report, which included the statements about weapons. (Def. 56.1 ¶ 18; Pl. 56.1 ¶ 18.) In addition, after receiving Boud's report regarding the September 5 incident, United decided to close the Transitional Duty office for the day. (Def. 56.1 ¶ 19; Pl. 56.1 ¶ 19; Bruno Decl., Ex. D ("Eget Dep.") at 4; Manns Decl., Ex. V.) Emails between other United personnel during this time also reflect concerns about Manns's behavior. For example, in response to Khan's email regarding the August 17 incident, one of Manns's supervisors stated that the way Manns "handles things" is

6

"obviously unacceptable" and suggested having a meeting to discuss his behavior. (Manns Decl., Ex. P.) Eget agreed that they should hold a meeting, noting that Manns "worries" him. (Id.)

On September 7, 2012, Eget, Manns's supervisors Stefan Mayden and Brian McCaffrey, and Manns's union representatives met with Manns regarding these complaints. (Def. 56.1 ¶ 32.) During the meeting, Manns denied making any threatening comments. (Id. ¶ 33.) At the meeting, Manns was placed on paid suspension pending an investigation into the events. (Id. ¶ 35.) After this meeting, Eget discussed the issue with his supervisors, who directed him to fire Manns. (Id. ¶ 36; Eget Dep. at 41.)

On October 23, 2012, Manns met with Eget, his supervisors, and his union representatives again. (Def. 56.1 ¶ 38.) At this meeting, Manns was offered a "Last Chance Conditional Employment Agreement" ("Last Chance Agreement"), which would "allow him to return to work upon an evaluation and release by United's Employee Assistance Program." (Id.; Bruno Decl., Ex. R ("Last Chance Agreement").) Manns was informed that if he did not agree to abide by the terms of the Last Chance Agreement he would be terminated. (Def. 56.1 ¶ 39; Pl. 56.1 ¶ 39; Manns Decl. ¶ 37.) Instead of timely accepting the agreement, he post-dated it by a month "in order to give [himself] a month to negotiate about language in the document [he] objected to." (Manns Decl. ¶ 37.) Eget advised Manns that United needed a copy with "accurate information," but Manns never returned an appropriately dated agreement. (Def. 56.1 ¶¶ 40–41; Eget Dept. at 35.)

A termination meeting was scheduled for November 2, 2012. (Def. 56.1 ¶ 42.) Manns did not attend the meeting. (Id.) A termination letter dated November 13, 2012, was mailed to Manns. (Id.) The termination letter stated that Manns was terminated for failing to adhere to United's Working Together Guidelines: in particular, for failure to (1) treat each other with mutual respect; (2) communicate and perform all duties in a safe, courteous, helpful, competent, dependable, and

7

businesslike manner; (3) maintain a professional appearance while on duty or while representing United to the public; (4) refrain from aggressive or threatening behavior, whether through words or actions; (5) act in ways that reflect favorably on the company, himself and his co-workers; (6) use good judgment and open communication in all decisions; and (7) be truthful in all communications, whether oral, written or electronic. (Id. ¶ 43; Bruno Decl., Ex. Q ("Nov. 13 Termination Letter").)

## IV. Evidence of Discrimination

The evidence Manns presents to support an inference that United's actions were discriminatory falls into four categories.

First, he claims United fired him because United was "tired of [his] protests because they were made rigorously" and "pushed [him] out of [his] job in order to get an irritant out of their midst." (Manns Decl. ¶ 1.) Manns presents evidence of instances where United, Gallagher Basset, and Clinic employees expressed annoyance with his behavior to support this claim. (See, e.g., id. ¶ 12 (nurse at Clinic told another nurse to "watch out for him" and that "he is always here"); id. ¶ 29 (describing September 10 phone call to Manns from McCaffrey where McCaffrey used "aggressive, demeaning, and threatening language"); id., Ex. P (email from Carmen Alicea stating "Guess who called me?? Yes Mr. Manns").)

Second, he indicates that the behavior alleged in the reports described above stemmed from his disability. Manns introduces a September 10, 2012, report from Dr. Weinraub to support this claim. This report states that "it was clear [Manns's] emotional stress was stemming from exhaustion and concurrent physical pain" and that "as a consequence of the pain and difficulties in getting proper treatment 'he has been unable to control his temper and interact with workplace staff because he felt that his physical state was being ignored.'" (Id. ¶ 34; id., Ex. W.)

Third, he emphasizes that Eget and the other United employees who made the decision to fire him were aware that "he was an employee complaining about his medical condition and the workplace response" to that condition. (Pl. 56.1 ¶ 36.) Manns presents emails where United employees acknowledge that he is injured or otherwise receiving treatment to support this claim. (See, e.g., Manns Decl., Ex. P (email from Eget noting that Manns had "refused an injection").)

Fourth, he implies that United is now lying about the reason for his termination. Manns claims that "[a]lthough United says now that [he] was terminated for engaging in threatening behavior, the evidence shows that [he] was terminated for refusing to sign a document that contained admissions that [he] violated company rules." (Id. ¶ 1.)

## STANDARD OF REVIEW

Summary judgment is appropriate when the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). This Court's function is not to resolve disputed issues of fact but rather "to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

The moving party carries the initial burden of demonstrating the absence of a material factual question. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In determining whether this initial burden has been satisfied, a court must "construe the facts in the light most favorable to the nonmoving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks and citation omitted). Nevertheless, the nonmoving party cannot rest on speculations, conjecture, or denials but "must set forth specific facts showing that there is a genuine issue for trial." Rubens v. Mason, 527 F.3d 252, 254 (2d Cir. 2008) (internal quotation marks and citation omitted). A

genuine issue exists only where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249–50 (citations omitted).

In discrimination cases, courts must be mindful that "[a] victim of discrimination is . . . seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991). Nevertheless, the Second Circuit has recognized that "it is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." Abdu–Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001).

## DISCUSSION

Manns claims, and United does not appear to dispute, that Manns became disabled during his employment. Manns argues that United failed to accommodate his disability and wrongfully terminated him because of his disability in violation of the ADA and the Rehabilitation Act.

At the outset, the Court acknowledges that United has vigorously argued that Manns should not be permitted to proceed with his failure-to-accommodate claim throughout this litigation. (See Def. Mem. at 3.) In making this argument, United relies on the Court's January 29, 2014, Memorandum and Order, (D.E. # 17 ("Jan. 29 Order")), which United claims "allowed [Manns] to proceed with one claim only as against United, a claim for wrongful termination on the basis of disability under the ADA," (Def. Mem. at 3).

United overreads the Court's January 29 Order. This Order stated that the "only discernible claim" in Manns's pro se complaints was his wrongful-termination claim; it did not preclude the possibility that Manns could raise a failure-to-accommodate claim and did not dismiss any failure-

to-accommodate claim with prejudice. (Jan. 29 Order at 3.) After Manns obtained counsel, the Court twice granted Manns leave to file an amended complaint. (D.E. dated Aug. 6, 2014; D.E. dated Sept. 16, 2015.) United noted its objection in response to Manns's second request to file an amended complaint, (D.E. # 60), and the Court permitted Manns to file a fourth amended complaint over that objection, (D.E. dated Sept. 16, 2015). The Court therefore considers both the failure to accommodate and wrongful termination claims raised in the fourth amended complaint and concludes that United is entitled to summary judgment on both claims.

## I. Failure to Accommodate

The Court first addresses Manns's claim that United failed to provide reasonable accommodations for his disability in violation of the ADA and the Rehabilitation Act. Specifically, Manns claims that he was "seeking time off—with workers' compensation payments—so that he could heal." (Pl. Opp. at 13.) He notes that his injuries "flowed from the denial of [his requests] for time off," and that "similar request[s] had been granted earlier in his career," and that this time off "had allowed [him] to return to work full duty" in the past. (Id.)

Claims alleging disability discrimination in violation of the ADA and the Rehabilitation Act are subject to the burden-shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 96 (2d Cir. 2009) (applying McDonnell Douglas to the ADA); Reg'l Econ. Cmty. Action Program v. City of Middletown, 294 F.3d 35, 48–49 (2d Cir. 2002) (applying McDonnell Douglas to the Rehabilitation Act). Under this standard, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802.

Discrimination under either act includes failing to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.

McBride, 583 F.3d at 96 (ADA); Lyons v. Legal Aid Soc'y, 68 F.3d 1512, 1515 (2d Cir. 1995) (Rehabilitation Act). To establish a prima facie failure-to-accommodate claim, the plaintiff must show that (1) the plaintiff is a person with a disability under the meaning of the relevant statute; "(2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, [the] plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." McBride, 583 F.3d at 97; see also Lyons, 68 F.3d at 1515 (applying the same standard to the Rehabilitation Act). The plaintiff "bears the burdens of both production and persuasion as to the existence of some accommodation that would allow him to perform the essential functions of his employment." McMillan v. City of New York, 711 F.3d 120, 126 (2d Cir. 2013) (internal quotation marks, citations, and alterations omitted). "If a plaintiff suggests plausible accommodations, the burden of proof shifts to the defendant to demonstrate that such accommodations would present undue hardships and would therefore be unreasonable." Id. at 128.

United does not appear to dispute that Manns was a person with a disability or that United had notice of his disability. United argues that Manns's failure-to-accommodate claim fails on two grounds: (1) he never requested an accommodation and therefore United has not refused to make an accommodation; and (2) he has presented no evidence to show that the accommodation he now claims to have sought—an extended leave of absence from work—would have allowed him to perform the essential functions of his job. The Court will consider each claim in turn.

### A. Whether Manns Requested an Accommodation

United first argues that Manns never requested an extended leave of absence and that United, therefore, could not have "refused" to make such an accommodation. United argues that "it is the employee's responsibility to request the accommodation and inform the employer that an

accommodation is needed." (Def. Mem. at 5 (citing Graves v. Finch Pruyn & Co., 457 F.3d 181, 184–85 (2d Cir. 2006)).) United emphasizes that Manns admits he never requested an accommodation for a disability during his employment with United and that his request to be transferred to United's marketing department was based on his desire to promote his son's art work. (Def. Mem. at 5; Def. Reply at 11.)

United is correct that "generally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." Graves, 457 F.3d at 184. The Second Circuit has clarified that this general rule does not apply where "the disability is obvious," such that "the employer knew or reasonably should have known that the employee was disabled." Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 135 (2d Cir. 2008). In such instances, employers are expected to engage in "an interactive process with their employees and in that way work together to assess whether an employee's disability can be reasonably accommodated." Id. (internal quotation marks, citations, and alterations omitted). There is some evidence that United was aware that Manns wanted additional time off from work. For example, Beverly Khan, an employee in United's Transitional Duty Office, testified that "it appeared [Manns] wasn't interested in looking at the [light-duty] assignment. . . . He just wanted to be out of work." (Def. 56.1 ¶ 67; Bruno Decl., Ex. E ("Khan Dep.") at 72.) Similarly, Krystyna Boud, a Gallagher Basset employee, stated in a police report that Manns "refused to work modified duty." (Def. 56.1 ¶ 29; Bruno Decl., Ex. N ("Dec. 7 Police Report") at 3.) Assuming without deciding that these brief references are sufficient to give rise to a triable issue of fact as to whether United refused to make an accommodation, the Court turns to whether the requested accommodation was reasonable.

13

## B. Whether an Extended Leave of Absence from Work is a Reasonable Accommodation

United argues that even if Manns had requested an accommodation, "the undisputed facts in the record show that there was no accommodation that would allow plaintiff to perform the essential functions of his job as a ramp service employee." (Def. Mem. at 5.) As United notes, the "essential functions" of Manns's job includes lifting heavy baggage, boxes, and cargo. (Id.; Bruno Decl., Ex. I ("Ramp Service Employee Jobs Description").) United argues that Manns has not provided any evidence that he could perform these essential functions with an accommodation.[3] (Def. Mem. at 6.) Manns responds that he needed additional time off from work to recover from his injuries and implies that had he been given that time off he would have been able to return to his normal duties. (Pl. Opp. at 13.)

Under the ADA and the Rehabilitation Act, a "reasonable accommodation may include, inter alia, modification of job duties and schedules, alteration of the facilities in which a job is performed, acquisition of devices to assist the performance of job duties, and, under certain circumstances, reassignment to a vacant position." McBride, 583 F.3d at 97 (internal quotation marks and citation omitted) (ADA); Lyons, 68 F.3d at 1515 (Rehabilitation Act). As noted above, "[t]he plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment, including the existence of a vacant position for which she is qualified." McBride, 583 F.3d at 97; see also Dean v. Univ. of Buffalo Sch. of Med. & Biomedical Scis., 804 F.3d 178, 190 (2d Cir.

---

[3] United makes much of the fact that the medical evaluations Manns included in his social security application indicate that he was not capable of completing these duties. (Def. Mem. at 6.) However, these evaluations report Manns's capabilities without accommodation and have no bearing on whether he could perform the essential functions of his job with accommodations.

14

2015). However, "[a] reasonable accommodation can never involve the elimination of an essential function of a job." Shannon v. N.Y.C. Transit Auth., 332 F.3d 95, 100 (2d Cir. 2003).

Here, Manns implies that he would have been able to return to his full duties if he had been granted an additional leave of absence. He does not, however, provide a timeframe for his recovery or any medical evidence that a leave of absence would have allowed him to perform his duties upon his return. The Second Circuit has held that a leave of absence for a finite period may be a reasonable accommodation if an employee shows that leave will enable him to perform the essential functions of the job when he return to work. See Graves v. Finch Pruyn & Co., Inc., 353 F. App'x 558, 560–61 (2d Cir. 2009). The Second Circuit has indicated, however, that an indefinite period is not a reasonable accommodation. See Parker v. Columbia Pictures Indus., 204 F.3d 326, 338 (2d Cir. 2000) (stating in dicta that "the duty to make reasonable accommodations does not, of course, require an employer to hold an injured employee's position open indefinitely while the employee attempts to recover"); Vangas v. Montefiore Med. Ctr., Nos. 15-1514-cv, 15-1562-cv, 2016 WL 2909354, at *5 (2d Cir. May 19, 2016) (holding that a request for an indefinite leave of absence is not a reasonable accommodation under the New York State Human Rights Law). Manns's request for an indefinite leave of absence is therefore not a reasonable accommodation.

Even if the Court interpreted his claim as one for a fixed period of leave, Manns has still failed to provide any medical evidence that such an accommodation would allow him to perform the essential functions of his position. He has offered no medical testimony or reports to support his assertion that had he been given additional time off from work he would have been able to recover. The only medical reports he presents are (1) a letter from his psychologist, Dr. Weinraub, that in early June Manns had "reported a physical breakdown to the point that he could not get out

of bed and move his body freely" and that as a result of these issues "he has been unable to control his temper and interact with workplace staff because he felt that his physical state was being ignored," (Manns Decl. ¶ 9; id., Ex. W); and (2) summaries of two reports from his social security determination, which reported that he was "totally disabled" as of August 17, 2012, (id. ¶ 40; id., Ex. CC). Neither could support a finding by a jury that an extended period away from work would be a reasonable accommodation that would allow Manns to perform the essential duties of his position. The Court therefore grants United's motion for summary judgment on Manns's failure-to-accommodate claim.

## II. Wrongful Termination

Second, Manns argues that he was wrongfully terminated because of his disability. Manns claims that United fired him because they were "tired of his protests" regarding his workplace injury "because they were made vigorously" and they "pushed [him] out of his job in order to get an irritant out of their midst." (Pl. Opp. at 1.) United maintains that Manns was terminated for violating United's anti-violence policy. (Def. Mem. at 1.) United denies Manns's implication that United fired him because of his injuries and his complaints about his injuries and argues that Manns's allegations of discrimination are based on mere speculation and conclusory allegations. (Id.)

As with Manns's failure-to-accommodate claim, Manns must first establish a prima facie discrimination claim. To establish a prima facie discrimination claim for wrongful termination under either the ADA or the Rehabilitation Act, a plaintiff must show that "(1) his employer is subject to [the statute]; (2) he was disabled within the meaning of [the statute]; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accomodation; and (4) he suffered an adverse employment action because of his disability." Sista v. CDC Ixis N.

Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006) (internal quotation marks and citation omitted) (ADA); Kinsella v. Rumsfeld, 320 F.3d 309, 314 (2d Cir. 2003) (Rehabilitation Act). If a plaintiff establishes a prima facie case of discrimination, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision. McDonnell Douglas, 411 U.S. at 802. If the defendant establishes a nondiscriminatory reason, the burden shifts back to the plaintiff to raise a triable issue of fact as to whether the legitimate, nondiscriminatory reason is merely pretextual. Id. at 804.

Once again, United does not dispute that United is subject to these statutes or that Manns was disabled within the meaning of the statutes. Instead, United claims that Manns's wrongful-termination claim fails on four grounds: (1) he has not shown that he was otherwise qualified to perform the essential functions of his job; (2) he has not raised an inference that his termination was because of his disability; (3) United had a valid nondiscriminatory reason for his termination; and (4) Manns has not presented evidence that this nondiscriminatory reason for termination was pretextual. Because the Court concludes that United had a valid nondiscriminatory reason for terminating his employment and that Manns has failed to present any evidence that United's nondiscriminatory reason was pretextual, the Court declines to address the remaining claims.

United states that Manns was terminated because of his "aggressive and threatening behavior in the workplace in violation of United's anti-violence policy." (Def. Mem. at 8.) Specifically, United presents evidence that Manns was terminated as a result of four reports United received regarding Manns's behavior: (1) Khan's August 3 Workplace Violence Report; (2) Khan's August 17 Workplace Violence Report; (3) Parker's August 21 Workplace Violence Report; and (4) Boud's September 5 police report. (Def. Mem. at 8.) As a result of these reports, United took a number of actions, reflecting the fact that they took these reports seriously. For

example, after Boud's September 5 police report, United shut down the Clinic. (See Def. 56.1 ¶ 19; Eget Dep. at 4; Manns Decl., Ex. V.) Reports of inappropriate or threatening behavior provide a sufficient nondiscriminatory reason for terminating an employee. Such "on-the-job misconduct" has been held to constitute a "legitimate and nondiscriminatory reason[] for terminating employment," even where, as here, the misconduct is caused by the allegedly disabling condition. Canales-Jacobs v. N.Y. State Office of Court Admin., 640 F. Supp. 2d 482, 500 (S.D.N.Y. 2009) (citing Raytheon v. Hernandez, 540 U.S. 44, 54 n.6 (2003)).

Manns does not dispute that United received these complaints. Instead, he argues that there is a dispute of fact as to whether Manns's "complaints amount to 'threats' and whether anyone he spoke to actually felt endangered." (Pl. Opp. at 14.) United replies that despite Manns's claim that no one felt threatened, "the record nonetheless indicates that as a result of plaintiff's behavior Corporate Security monitored plaintiff, the Clinic was shut down in September 2012 . . . , a new glass door with a security locking system was installed in Ms. Khan's work place," and "[c]oncerns about plaintiff's behavior prompted an investigation." (Def. Reply at 4.) It is undisputed that the reported behavior did not comply with United's employment policies. To the extent Manns challenges what was reported, it is not the truth of the complaints, but the fact that they were reported that matters for the instant motion. McPherson v. N.Y. City Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006) (stating that in discrimination cases the court is "decidedly not interested in the truth of the allegations against plaintiff" and is instead interested "in what motivated the employer" (internal quotation marks and citation omitted)).

After receiving these complaints, rather than fire Manns immediately—as it would have been justified in doing—United conducted an investigation and offered Manns the opportunity to continue his employment pursuant to a Last Chance Agreement, which required that he participate

in United's Employee Assistance Program and submit to a behavioral health evaluation. (Last Chance Agreement at 1.) Manns did not return a signed and appropriately dated agreement and was subsequently terminated. His failure to accept the agreement provides another nondiscriminatory basis for his termination. See Klaper v. Cypress Hills Cemetary, No. 10-CV-1811 (NGG) (LB), 2014 WL 1343449, at * 7 (E.D.N.Y. Mar. 31, 2014) (holding violation of last chance stipulation constituted a legitimate, nondiscriminatory justification for defendant's decision to terminate his employment). In light of these complaints, the resulting investigation, and Manns's failure to sign the Last Chance Agreement, even if Manns makes out a prima facie case of discrimination, United has sufficiently established a nondiscriminatory reason for Manns's termination.

"[O]nce the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision," the plaintiff "must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000). A plaintiff can demonstrate pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). Although Manns argues that United's nondiscriminatory justification is pretextual and that they fired him because they were "tired of his protests" and wanted to "get an irritant out of their midst," these conclusory claims are not sufficient to show either that United was motivated by discrimination or that United's nondiscriminatory reason is not credible. The evidence Manns presents in support of his claim provides no indication that he was fired because of his disability. The emails he submits in support of this claim demonstrate

only that the employees who made the complaints were exasperated with his behavior. (See, e.g., Manns Decl., Ex. N ("He submitted another claim"); id.., Ex. P ("Guess who called me?? Yes Mr. Manns.").) If anything, this evidence bolsters, rather than undermines, United's explanation for his termination. Manns has therefore failed to provide any evidence that the proffered reason for his termination was a pretext for discrimination. The Court therefore grants United's motion for summary judgment on Manns's wrongful-termination claim.

## CONCLUSION

For these reasons, the Court grants United's motion for summary judgment. The Clerk of Court is directed to enter judgment accordingly and close the case.

SO ORDERED.

Dated: November 18, 2016
Brooklyn, New York

s/ Carol Bagley Amon

_____
Carol Bagley Amon
United States District Judge